IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UTAH ENVIRONMENTAL CONGRESS, a Utah nonprofit corporation, and HIGH UINTAS PRESERVATION COUNCIL, a Utah nonprofit corporation,<br><br>                    Plaintiffs,<br><br><br><br>                    vs.<br><br><br><br>EILEEN RICHMOND, in her official capacity as Acting Forest Supervisor of the Ashley National Forest, DALE BOSWORTH, as Chief of the United States Forest Service, and the UNITED STATES FOREST SERVICE,<br><br>                    Defendants. | MEMORANDUM DECISION AND ORDER<br><br><br><br><br><br>Case No. 2:05-CV-72 TC |

This matter is before the court on Plaintiffs Utah Environmental Congress ("UEC") and

High Uintas Preservation Council's ("HUPC") motion seeking review and reversal of a Decision

Notice and Finding of No Significant Impact issued by Ashley National Forest ("Ashley NF")

that amended the Ashley NF Forest Plan by modifying the number of management indicator

species ("MIS") monitored within the forest.  Plaintiffs also seek reversal of a Record of

Decision approving the Trout Slope West Timber Sale Project ("Trout Slope Project"), which

allows for the harvesting of timber in particular areas of the Ashley NF.  Plaintiffs' motion is

governed by Federal Rule of Appellate Procedure 15 and Olenhouse v. Commodity Credit Corp.,

42 F.3d 1560, 1580 (10th Cir. 1994).  The court concludes that Defendants' decision to

significantly reduce the number of MIS monitored in Ashley NF must be reversed because implementation of that amendment would foreclose Defendants' ability to comply with species monitoring obligations imposed by federal regulations.  The court affirms the approval of the Trout Slope Project, holding that the process followed by Defendants was legally sufficient.

**Background**

**The Legal Framework Governing National Forest Actions**

A brief overview of the applicable statutory and regulatory framework governing the challenged actions is necessary for a full understanding of this dispute.  Several statutory schemes, evolving regulatory standards, and forest-specific policies converge in this motion.  Featured most prominently are the National Forest Management Act ("NFMA"),[1] the National Environmental Policy Act ("NEPA"),[2] and the Endangered Species Act ("ESA").[3]  The relevant facets of each act are outlined below.

**A.  NFMA**

NFMA guides the management of the entire National Forest System, providing general administrative guidelines and creating mechanisms enabling national forests to make management decisions at the individual forest level, as such decisions would not be feasible to direct on a systemwide basis.  NFMA contemplates two distinct levels of management activities: the forest level and the project-specific level.  Forest level management is accomplished through the adoption of a land management plan, more commonly designated a "Forest Plan," which outlines management goals for an entire national forest, such as Ashley NF.  The project-specific

---

[1] 16 U.S.C.A. §§ 1600-1687 (2000).

[2] 42 U.S.C.A. §§ 4331-4370f (2003).

[3] 16 U.S.C.A. §§ 1531-1544 (2000).

level of management relates to the method by which a national forest implements discrete projects that may affect the forest in some manner.  Any actions taken at the project-specific level must comply with the national forest's Forest Plan.  See 16 U.S.C.A. § 1604(i) (2000).

**B.  NEPA**

NEPA requires federal agencies to consider potential environmental effects when making decisions that "may have an impact on man's environment."  See 42 U.S.C.A. 4332(2)(c) (2003). NEPA is a procedural statute that does not dictate particular results, but simply outlines the necessary process federal agency decisionmaking must follow.  See id.; Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 737 (1998).  The Council on Environmental Quality has promulgated regulations detailing an agency's obligations under NEPA.  See 40 C.F.R. §§ 1500-08.  The regulations describe three distinct categories of agency action and outline the required procedural steps the agency must follow when assessing potential environmental impact for each type of action: (1) actions that may significantly affect the environment and therefore generally require an Environmental Impact Statement ("EIS"), see id. § 1501.4(a)(1); (2) actions that may or may not have a significant environmental impact and therefore ordinarily require a more limited Environmental Assessment ("EA") to determine if an EIS is necessary, id. § 1501.4(b)-(c); and (3) actions that typically do not have a significant effect on the environment and therefore qualify for a categorical exclusion from the requirement of either an EA or EIS, id. §§ 1500.4(p), 1501.4(a)(2), and 1508.4.

**C.  ESA**

Regulations implementing the ESA require a formal consultation process with the U. S. Fish and Wildlife Service if a management activity is likely to adversely affect an endangered species.  Id. § 402.14(a)-(b).

3

**The Challenged Actions**

Plaintiffs challenge two actions taken by Defendants: (1) an amendment to the Ashley NF Forest Plan decreasing the number of MIS from twelve to two (the "MIS Amendment"), and (2) approval of the Trout Slope Project.

**A.  The MIS Amendment**

The stated purpose of the MIS Amendment is to designate a set of MIS whose population changes indicate the effects of management activities for the communities they represent. (Administrative Record ("AR") MIS1634.)  The concept of MIS was adopted in the 1982 regulations implementing NFMA's requirement that Forest Plans "provide for diversity of plant and animal communities."  16 U.S.C.A. § 1604(g)(3)(B).

Under the MIS concept, certain representative species are selected and monitored to help determine the effects of management activities on overall forest health.  See 36 C.F.R. § 219.19(a)(1) (1982) (changes in population of MIS "are believed to indicate the effects of management activities" on the species).  The MIS Amendment amends Ashley NF's Forest Plan, which was originally adopted in 1986.  The 1986 Forest Plan designated twelve species as MIS. The MIS Amendment removed all but two of those species from MIS designation without adding any new MIS.  Defendants issued an EA,  Finding of No Significant Impact ("FONSI"), and Decision Notice on June 7, 2004.  UEC and HUPC both filed ultimately unsuccessful administrative appeals following the approval of the MIS Amendment.

**B.  Trout Slope Project**

The Trout Slope Project is designed to salvage dead and green trees to recover their economic value, reduce fuel loads, prevent blow down and jack-strawed timber, reduce tree density, and move the project area toward desired future conditions.  (See AR TS00126.)  The

portion of Ashley NF in which the Trout Slope Project is located is divided into three "treatment areas," totaling about 18,500 acres.  Ashley NF itself spans 1,384,132 acres.  The project contemplates logging of 9.2 million board feet on 2066 acres located within the analysis area. (See id. at TS00156 and TS04321.)  Defendants released the Record of Decision and EIS approving the project on July 1, 2004.  Plaintiffs' attempts to reverse project approval on administrative appeal were unsuccessful.

## Standard of Review

Neither NFMA nor NEPA authorize a private right of action.  While the ESA does provide for private enforcement if certain conditions are met, see 16 U.S.C.A. § 1540(g), Plaintiffs' ESA claim in this suit is presented to the court under the Administrative Procedures Act ("APA").[4]  (See Compl. ¶ 2 ("[T]he APA gives this Court jurisdiction to hear the claims in Plaintiffs' Complaint . . . . Plaintiffs allege that all actions challenged in the Complaint are final actions for purposes of review and that the Defendants are taking actions that are arbitrary and capricious, that are abuses of discretion, and that are not in accordance with the law.").)  As a result, all of Plaintiffs' claims will be reviewed as challenges brought under the APA. Specifically, review of Defendants' decisions are governed by § 706(2)(A) of the APA.  Colo. Envtl. Coalition v. Dombeck, 185 F.3d 1162, 1167 (10th Cir. 1999).  This court will only set aside the challenged actions if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C.A. § 706(2)(A); see also Biodiversity Legal Found. v. Babbitt, 146 F.3d 1249, 1252 (10th Cir. 1998) ("Under the APA, administrative decisions involving the ESA are upheld unless they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." (internal quotation omitted)).  This court "is limited to

_____

[4]5 U.S.C.A. §§ 701-706 (1996).

determining whether the agency substantially complied with statutory and regulatory procedures, whether substantial evidence supports [the agency's] factual determinations, and whether [the agency's] action is an abuse of discretion." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 401, 413-16 (1971). The reviewing court must defer to the agency's legislative interpretation unless that interpretation is contrary to plain and unambiguous statutory language or when the agency's interpretation is otherwise impermissible. See Chevron U.S.A., Inc. v. Nat'l Res. Def. Council, 467 U.S. 837, 843-45 (1984); Quivira Min. Co. v. Nuclear Regulatory Comm'n, 866 F.2d 1246, 1249 (10th Cir. 1989). But such deference does not foreclose meaningful review and this court "will reverse if the decision is not supported by substantial evidence." Hoyle v. Babbitt, 129 F.3d 1377, 1382 (10th Cir. 1997).

## Analysis

Although the two actions Plaintiffs challenge in their motion followed separate procedural paths, Defendants were actively pursuing both projects contemporaneously. Defendants issued an EA, FONSI, and Decision Notice on June 7, 2004, that announced the approval of the proposed MIS Amendment. The Trout Slope Project was approved on July 1, 2004, following the issuance of an EIS and Record of Decision. The MIS Amendment was the first of the two challenged actions to be approved and there is some question concerning the potential effect of the MIS Amendment on the propriety of the Trout Slope Project's approval. As a result, the court will first analyze Defendants' adoption of the MIS Amendment before addressing the approval of the Trout Slope Project.

## The MIS Amendment

Ashley NF adopted its Forest Plan in 1986. At that time, the Forest Plan identified

twelve MIS.[5]  (See AR MIS00001.)  In 1999, the United States Forest Service directed local

Forest Service units to change MIS monitoring as needed if certain species were either not

adequate indicators of the health of the identified resources subject to forest management

activities or were not practical to monitor.  (See id. at MIS01338-41.)  Approximately four years

later, Defendants decided to reevaluate the MIS designated for use in Ashley NF and issued a

Project Initiation Letter to that effect on November 15, 2003.  (See id. at MIS00143-46.)

About one month later, Defendants sent a scoping[6] letter to 800 parties requesting

comment on the proposed amendment of the MIS list.  In that letter, Defendants presented four

proposed alternative actions relating to MIS, one of which was a proposal of no action.  (Id. at

MIS00147-161.)  After reviewing comments received as a result of the scoping letter, Defendants

issued an EA, FONSI, and Decision Notice on June 7, 2004.  In the Decision Notice, Forest

Supervisor George A. Weldon announced his decision to select the proposed alternative that

reduced the number of MIS to two, retaining only the Northern goshawk and the Colorado River

cutthroat trout from the original list of twelve MIS.  In the Decision Notice/FONSI, Forest

Supervisor Weldon explained the decision by arguing that more MIS does not equal better forest

management and by identifying limitations on the usefulness of monitoring the MIS designated

in the 1986 Forest Plan.  (See id. at MIS1624.)  Additionally, through the Decision

Notice/FONSI, Forest Supervisor Weldon highlighted the costs associated with monitoring MIS

---

[5]The twelve MIS identified in the 1986 Ashley NF Forest Plane were: sage grouse,
Lincoln's sparrow, song sparrow, red-naped sapsucker, warbling vireo, Northern goshawk,
Colorado River cutthroat trout, macroinvertebrates, golden eagle, white-tailed ptarmigan, mule
deer, and Rocky Mountain elk.  (See AR MIS1622-23.)

[6]"Scoping" is a term of art found in the regulations implementing NEPA.  The term refers
to the "process for determining the scope of issues to be addressed and for identifying the
significant issues related to a proposed action."  40 C.F.R. § 1501.7.

and stated that it is not desirable "to keep investing in something that doesn't help us make better decisions."  (Id.)

Plaintiffs claim that the MIS Amendment violates NFMA and the applicable regulations implementing that act because the selection process used by Defendants to designate MIS is inconsistent with the statutory and regulatory requirements.  More fundamentally, Plaintiffs argue that implementation of the MIS Amendment will make it impossible for Defendants to comply with monitoring obligations imposed by federal law.[7]

As discussed above, the requirement that national forests identify and monitor MIS was imposed by the regulations implementing NFMA.  See 36 C.F.R. § 219.19 (1982).  MIS monitoring was adopted as a means to gauge the effect of management activities and to ensure compliance with NFMA's mandate that forests "provide for diversity of plant and animal communities," 16 U.S.C.A. § 1604(g)(3)(B), while simultaneously "provid[ing] for multiple use and sustained yield of the products and services obtained therefrom," id. § 1604(e)(1).

The regulations outlining the purpose of MIS and the manner in which MIS should be identified and monitored have been substantially altered over the past years.  The 1982 regulations were effectively repealed by regulations issued in 2000.  See 65 Fed. Reg. 67,568 (Nov. 9, 2000).  Those regulations called upon responsible officials to consider the "best available science" when considering the approval of management activities.  See 36 C.F.R. § 219.35(a) (2000).  The 2000 regulations also provided for a transition period, giving responsible officials the option of proceeding with qualifying proposed actions under either the 1982 rule or

---

[7]Plaintiffs also claim that the approval of the MIS Amendment violated NEPA.  Because the court concludes that the MIS Amendment is inconsistent with applicable regulations and is therefore improper, there is no reason to address Plaintiffs' NEPA claims insofar as they  relate to the MIS Amendment.

the new rule.  See id. § 219.35(b).  The transition period ended when the Department of Agriculture issued a final rule in 2005.  See 70 Fed. Reg. 1023 (Jan. 5, 2005).  The new rule does not require monitoring of MIS.  See id. at 1048 ("The concept of MIS was not included in the 2002 proposed rule and is not in the final rule . . . because recent scientific evidence identified flaws in the MIS concept.").

The regulations in effect at the time Defendants began considering the MIS Amendment allowed responsible officials to elect whether to follow the 1982 regulations or the version of the regulations in effect in 2002.  See 67 Fed. Reg. 35431, 35434 (May 20, 2002).  Defendants concede that the MIS Amendment was pursued under the 1982 rule.  That "choice of methodology is entitled to deference."  Utah Envtl. Congress v. Bosworth, 421 F.3d 1105, 1110 (10th Cir. 2005) ("UEC II").

There is some question, though, whether Defendants, despite their decision to amend the Ashley NF Forest Plan according to the procedures set forth under the 1982 rule, were nevertheless obligated to consider the "best available science" as required by more recent regulations.  Defendants contend that they were so obligated and that their consideration of the best available science required a modification the MIS approach prescribed in the 1982 rule.  As a result, Defendants argue that it is improper to gauge their compliance with NFMA by relying on judicial guidance addressing the 1982 rule alone, without consideration of the best available science.  In other words, Defendants contend that the MIS approach contained in the 1982 rule should be followed as long as responsible officials determine that approach is consistent with the course charted by the "best available science" of today.  Defendants' position is consistent with an interpretive rule issued by the Department of Agriculture after the MIS Amendment was approved, which states that "[u]nder the transition provisions of paragraph (a), the responsible

official must consider the best available science in implementing and, if appropriate, in amending

existing plans." 69 Fed. Reg. 58055, 58057 (Sept. 29, 2004).

In UEC II the Tenth Circuit rejected the Forest Service's attempt to use the best available

science mandate to justify approval of a management action when the Forest Service had elected

to apply the 1982 rule to its decision. 41 F.3d at 1110 ("While the Forest Service now contends

that it was not required to comply with the 1982 rule, it nonetheless exercised its discretion to

apply the 1982 rule when issuing its Decision Notice and Final Decision.").

Similar to UEC II, Defendants here have conceded that the MIS Amendment was

governed by the 1982 rule and there is nothing in the EA, FONSI, or Record of Decision that

indicates a departure from the 1982 rule in the name of the "best available science." (See Defs.'

Br. in Supp. of the USFS's Decisions and in Opp'n to Pls.' Olenhouse Mot. at 19 ("Therefore,

although the 1982 rule was in fact superseded, its provisions could be, and were, applied. And,

in fact, [Defendants] used the 1982 provisions in the process of implementing the MIS

Amendment to the [Ashley NF] Forest Plan.") (footnote omitted).) As a result--despite

Defendants' reliance on the "best available science" requirement in their pleadings before this

court--the court will analyze the propriety of the MIS Amendment under the 1982 rule

unmodified by the subsequent best-available-science direction.

The 1982 regulations directed that "[i]n order to estimate the effects of each

[management] alternative on fish and wildlife populations, certain vertebrate and/or invertebrate

species present in the area shall be identified and selected as [MIS] and the reasons for their

selection will be stated." 36 C.F.R. § 219.19(a)(1) (emphasis added). The regulations further

provided that MIS "shall be selected because their population changes are believed to indicate

the effects of management activities." Id. To guide the MIS selection process, the regulations

then directed decisionmakers to consider the following species "where appropriate" when

selecting MIS:

> Endangered and threatened plant and animal species identified on State and
> Federal lists for the planning area; species with special habitat needs that may be
> influenced significantly by planned management programs; species commonly
> hunted, fished, or trapped; non-game species of special interest; and additional
> plant or animal species selected because their population changes are believed to
> indicate the effects of management activities on other species of selected major
> biological communities or on water quality.

<u>Id.</u>

Plaintiffs claim that the process followed by Defendants when deciding to reduce the

number of MIS in Ashley NF from twelve to two was arbitrary and capricious because the

selection criteria used by Defendants conflict with the guidance provided by the applicable

regulations and because Defendants disregarded their own procedural direction when making the

final decision.  Plaintiffs' more fundamental claim is that the MIS Amendment so dramatically

reduces MIS that its approval will effectively foreclose Defendants' ability to comply with

monitoring requirements imposed by applicable federal law.

The stated purpose of the MIS Amendment process was "to identify a set of MIS whose

population changes indicate the effects of management activities for the community they

represent."  (AR MIS1634.)  In an effort to comply with the 1982 rule, Defendants identified

nine criteria that they analyzed when deciding whether to list a particular species as an MIS.

1. The species life history relates to forest management.
2. The species is a yearlong resident on the planning unit (i.e., not migratory).
3. The species is logistically feasible and cost effective to collect population size
   and trend data.
4. The overall local population is large enough to enable sample sizes sufficient
   for reliable statistical analysis and to fluctuate without threat of extinction so
   that the population trends can be analyzed relative to management.
5. The species is not hunted or trapped, fished or stocked (i.e., the forest has little
   control over population objectives or levels).
6. The species is not dramatically cyclic.

7. The species is somewhat representative of other species that use the habitat type.
8. The species and its habitat are widely distributed on the planning unit.
9. Species from adjacent units are considered so that analysis data from adjacent forests can be compared and contrasted to local forests.

(Id. at MIS1661-62.)

Plaintiffs take exception to criteria 2, 5, and 8.  Regarding criterion 2, Plaintiffs argue that crediting yearlong residency of a species is improper.  The 1982 regulations and the Forest Service Manual both direct decisionmakers to consider endangered and threatened species, as well as species considered important for commercial and recreational purposes.  See 36 C.F.R. § 219.19(a)(1); Forest Service Manual 2621.1.   According to Plaintiffs, many such species are migratory and may reside in Ashley NF only on a seasonal basis.  Penalizing such species for a failure to reside yearlong in the forest is, in Plaintiffs' view, arbitrary.

Plaintiffs next argue that criterion 5 directly conflicts with the regulations governing MIS selection because those regulations expressly direct decisionmakers to consider "species commonly hunted, fished, or trapped."  36 C.F.R. § 219.19(a)(1).  Accordingly, Plaintiffs assert that Defendants' consideration of criterion 5 was improper.

Finally, Plaintiffs claim that criterion 8 is arbitrary because it penalizes species that the regulations expressly direct decisionmakers to consider.  Specifically, Plaintiffs point out that many endangered and threatened species by definition have small populations and therefore are not widely disbursed throughout the forest.  Plaintiffs therefore contend that Defendants' consideration of criterion 8 was improper.

Defendants respond that the nine criteria it developed did not limit or otherwise foreclose consideration of any species, but simply aided in the process of weighing and determining which species would best serve the goals of NFMA and the applicable regulations.  But Plaintiffs reply

12

that Defendants did not even follow their own guidelines when weighing the nine criteria and that the outcome of the MIS Amendment process illustrates that Defendants primarily relied on the migratory status of the species when deciding whether to designate that species as an MIS.

In support of their position, Plaintiffs cite the EA itself, which states that "[i]f species met at least six of the [nine] criteria, the recommendation was to retain that species."  (AR MIS1662.) Despite that statement, the EA recommends dropping as MIS five species that meet at least six of the nine criteria.  (See id.)  Plaintiffs argue that the distinction between those species that met at least six of the nine criteria and were recommended for retention as MIS and those species that met at least six of the nine criteria and were recommended to be dropped as MIS was the species' migratory status.  (See id.)

The applicable regulations make no mention of whether a species's migratory status should be considered when evaluating the appropriateness of that species serving as a MIS. Defendants argue that the migratory status of a species is relevant and is a permissible factor to consider.  According to Defendants, migratory species may not serve as a reliable indicator of the effect of management activities due to the fact that population trends may be affected by environmental conditions external to the forest.  In other words, data trends of a migratory species may be attributable to activity in habitats, other than Ashley NF, that are utilized by the species.

The court agrees with Plaintiffs' contention that a single factor, such as migratory status, should not serve as the deciding factor for inclusion or exclusion of any species as a MIS.  But the record here does not support the conclusion that Defendants relied on only one factor or otherwise acted arbitrarily or capriciously in considering criteria 2, 5, and 8 when reevaluating forest MIS.  For example, the record does not support Plaintiffs' argument that migratory status

13

was the secret indicator that determined a species's MIS fate.  As Defendants point out, a portion

of the Northern goshawk population (one of the two species retained as MIS) is migratory.  (See

id. at MIS1662 n.1.)  Further, in compliance with the 1982 regulations, Defendants did consider

species that are commonly hunted, fished, or trapped (e.g., mule deer and Rocky Mountain elk).

(See id. at MIS1641.)  Additionally, Plaintiffs unduly discount the fact that Defendants'

weighing of the nine selection criteria was more involved than simply checking "yes" or "no"

when assessing each criterion.  Defendants actually used a point system for each criterion that

ranged from one to three.  Consequently, a species could score a two on a single criterion,

complicating the assessment of whether the species truly "meets" that criterion.[8]

Only three of the analyzed species "strongly met" six or more of the selection criteria:

Northern goshawk, Colorado River cutthroat trout, and macroinvertebrates.  Two of those three

were ultimately selected to serve as MIS.  Defendants justify the decision to remove

macroinvertebrates as a MIS, even though that species "strongly met" eight of the nine selection

criteria, (see id. at MIS1641), by alleging that monitoring of macroinvertebrates does not best

serve the goals of the MIS system because of problems associated with gathering population

information.  (See id.  at MIS1660-61.)  The record contains no significant indication that the

Forest Service acted arbitrarily or capriciously in deciding to retain Northern goshawk and

Colorado River cutthroat trout as MIS and not retain macroinvertebrates as a MIS.

More troublesome is Defendants' decision to retain a very small number of MIS, which,

---

[8]By way of illustration, the song sparrow was not retained as a MIS even though,
according to the table located in Appendix A of the EA, it met seven of the nine selection
criteria.  (See AR MIS1662.)  But the more detailed analysis, contained in the body of the EA,
reveals that the song sparrow only "strongly met" three criteria while the Colorado River
cutthroat trout, one of the two species retained as a MIS, "strongly met" seven criteria.  (See id.
at MIS1641.)

Plaintiffs assert, indicates that Defendants are not following NFMA and its implementing regulations.  While it may not be arbitrary or capricious to grant or deny a particular species MIS status, the ultimate result of the selection process could be impermissible if it effectively cripples Defendants' ability to comply with monitoring obligations.  <u>UEC II</u> strongly implies that the Forest Service is obligated to select and effectively monitor sufficient MIS to enable it to adequately gauge the effect of management activities.  <u>See</u> 421 F.3d at 1114 ("Selecting only one or two (or a few) acceptable MIS actually present in a project area cannot satisfy the overall monitoring obligations of § 219.19.").  Although <u>UEC II</u> involved a challenge to the sufficiency of MIS data in a particular project area rather than a challenge to the sufficiency of MIS designation in an overall Forest Plan, its reasoning is instructive here.  In fact, <u>UEC II</u> compels the conclusion that, although the method employed by Defendants when selecting MIS for the Ashley NF Forest Plan was not improper, the result reached at the conclusion of the process cannot be sustained.

In <u>UEC II</u>, the Tenth Circuit concluded that analysis of two MIS in a project area is insufficient to meet the monitoring obligations imposed by federal law.  Here, Defendants have not merely limited monitoring activity to two MIS in a specific project area, but have actually limited the total number of MIS in the entire forest to just two species.  According to Defendants, the Colorado River cutthroat trout and Northern goshawk represent 50% of the total area of Ashley NF.  (Defs.' Br. in Supp. of the USFS's Decisions and in Opp'n to Pls.' Olenhouse Mot. at 26.)  Therefore, by Defendants' own calculation, following approval of the MIS Amendment, there are no MIS designated for half of Ashley NF.  Defendants argue that they can still comply with NFMA requirements by utilizing techniques that focus on habitat changes rather than MIS trends to gauge the effects of management activities.  But the Tenth Circuit has held that habitat

trend data is not a substitute for MIS monitoring and that the monitoring obligations of the 1982 rule are only satisfied when adequate MIS data is analyzed.  See Utah Envtl. Congress v. Bosworth, 372 F.3d 1219, 1226-27 (10th Cir. 2004) ("UEC I").

The record indicates that the MIS Amendment was pursued in an attempt to identify only the most helpful MIS possible.  But the 1982 rule cannot be properly read as simply imposing a requirement that exceptionally helpful and cost-effective MIS be selected and monitored.  Compliance with the regulatory scheme may require Defendants to select MIS that are not ideal, but that may nevertheless aid the process of identifying and understanding the effect of various forest management activities.  The court concludes that approval of the MIS Amendment was improper and reverses that decision.

**The Trout Slope Project**

Plaintiffs argue that Defendants' approval of the Trout Slope Project was improper for a number of reasons.  The allegations can be reduced to the following claims: approval was improper because (1) the project will result in violations of the Ashley NF Forest Plan, (2) Defendants' MIS analysis was insufficient to meet regulatory requirements, and (3) Defendants violated the ESA by failing to consult with the U.S. Fish and Wildlife Service concerning the possible negative effects that project approval would have on Ashley NF's lynx population.  Each allegation will be discussed in turn.

**A.  Alleged violations of the Ashley NF Forest Plan**

Plaintiffs contend that the Trout Slope Project will violate the Ashley NF Forest Plan's mandate to protect old-growth habitat and maintain or enhance habitat for sensitive and threatened species.  Accordingly, Plaintiffs contend the project's approval should be reversed.

**1.  Old growth**

The Ashley NF Forest Plan requires responsible officials to "designate and protect old growth areas for dependent species.  Old growth should be a minimum of 160 contiguous acres and have old growth characteristics."  (Forest Plan at IV-29.)  Additionally, the Forest Plan requires the retention of "5% of an area in old growth conditions at all times."  (Id.)  The Forest Plan also directs that special emphasis should be given to old-growth areas when taking steps to maintain wildlife habitat.  (Id. at IV-3.)

Plaintiffs argue that Defendants acted improperly when they concluded that approval of the Trout Slope Project would not result in a violation of old-growth standards.  According to Plaintiffs, Defendants relied upon timber stand exam data that does not accurately reflect the salient characteristics of old-growth habitat.[9]  The record reveals that, at least to some extent, Defendants relied on Hamilton's Characteristics of Old-Growth Forests in the Intermountain West (1993) when assessing the possible effect of project approval on old-growth areas.  But Plaintiffs claim that Defendants failed to fully consider all of the old-growth characteristics identified in that text.  According to Plaintiffs, the record reveals that only two of Hamilton's ten characteristics were relied upon by Defendants.  Plaintiffs further argue that Defendants improperly relied upon estimates of old growth due to the lack of an old-growth inventory and the fact that no old-growth stands have been designated.

A review of the record does reveal some confusion on the part of Defendants concerning exactly what may be properly designated "old growth."  (See AR TS04364 ("[O]ld growth is difficult to assess because no old growth inventory exists for the Ashley and no old growth

---

[9]Plaintiffs also complain that the data utilized by Defendants was not from the management area that will be impacted by the Trout Slope Project. Plaintiffs fail to provide any citations to the record in support of this proposition and offer no meaningful argument in relation to that claim.  Therefore, the court disregards that allegation.

stands have been designated.").)  The EIS discloses the methodology used by Defendants to determine that old-growth mandates will be met despite project approval and openly acknowledges that old-growth calculations are based on estimates because of the lack of data addressing old-growth designation.  Although the EIS may downplay the shortcomings of the Forest Service's methodology in this respect,[10] reversal is not warranted on this ground.  "The agency, not the reviewing court, is entrusted with the responsibility of considering the various modes of scientific evaluation . . . and choosing the one appropriate for the circumstances." Custer County Action Ass'n. v. Garvey, 256 F.3d 1024, 1036 (10th Cir. 2001) (internal quotation omitted); id. ("We cannot displace the agencies' choice between two conflicting views, even if we would have made a different choice had the matter been before us de novo.").  Further, "the Forest Service's interpretation of its Forest Plan should receive great deference from reviewing courts . . . ."  Martin v. Sierra Club, 168 F.3d 1, 4 (11th Cir. 1999).

The court concludes that Defendants did not act arbitrarily or capriciously when concluding that the Ashley NF Forest Plan's old-growth requirements could be met despite project approval.  The information relied upon by Defendants was sufficiently detailed to support their conclusion in this regard.

**2.  Sensitive and threatened species**

In addition to old-growth standards, the Ashley NF Forest Plan also mandates the completion of an inventory identifying, locating, and quantifying the presence of threatened or endangered species in the forest.  (Forest Plan at IV-31.)  The Forest Plan indicates that

---

[10]For example, in their pleadings Defendants identify three of Hamilton's criteria as "minimum characteristics," and state that additional criteria are relevant but not determinative of an old-growth classification.  (See Defs.' Br. in Supp. of the USFS's Decisions and in Opp'n to Pls.' Olenhouse Mot. at 17-18.)  Defendants fail to respond to Plaintiffs' assertion that timber stand data supplies information relevant to only two of Hamilton's criteria.

management activities should be allowed only if those activities will not adversely affect threatened or endangered species.  (See id. at IV-30.)  These standards were adopted in an effort to help the Forest Service achieve its objective to maintain or enhance the habitat of threatened or endangered species.  (See id.)  Plaintiffs identify four threatened or endangered species that they claim will be negatively affected by the Trout Slope Project: lynx, three-toed woodpecker, Northern goshawk, and Colorado River cutthroat trout.

### a. Lynx

Although the EIS acknowledges potential harm to lynx habitat as a result of project approval, that potential harm is disregarded, in part, on grounds that it is uncertain whether any lynx actually reside in the project area.  (See AR TS04421.)  Plaintiffs do not dispute the lack of information indicating the presence of lynx in the project area, but rather suggest that the project area contains habitat suitable for lynx and that the presence of lynx can therefore be inferred. Plaintiffs also argue that Defendants have failed to undertake adequate inventory activities and that such a failure contributes to the lack of information about lynx population in the project area.

After reviewing the administrative record, the court agrees that there is only minimal, circumstantial evidence that any lynx reside in the project area.  Even so, in the EIS, Defendants assumed the presence of lynx for the purpose of analysis, which ameliorates concerns about the lack of population data.  Cf. Silverton Snowmobile Club v. U.S. Forest Serv., 433 F.3d 772, 782 (10th Cir. 2006) (rejecting claim that assuming the presence of lynx population is an impermissible practice under NEPA).  Working under the assumption that a lynx population existed within the project area, Defendants concluded that the impact on the species would be minimal at best.  Although Plaintiffs disagree with that assessment, the court is not persuaded that Defendants' conclusion in this respect is arbitrary or capricious.

**b. Other species**

Defendants contend that approval of the Trout Slope Project is consistent with the Ashley NF Forest Plan because any impact to threatened or sensitive species, specifically lynx and the three-toed woodpecker,[11] would occur on the individual level and not affect overall species viability.  Plaintiffs respond that an interpretation of the Ashley NF Forest Plan that allows management activities as long as potential harm is limited to "individuals" within a species is untenable and should be rejected.

The court finds support for Defendants' interpretation of the Ashley NF Forest Plan.  The Forest Plan objective Plaintiffs rely upon requires the protection of certain habitats in order to maintain or enhance the status of threatened or endangered "species" that reside in those habitats. (Forest Plan at IV-30.)  The dispute between the parties boils down to a disagreement over the requirements imposed by the Forest Plan.  "[T]he Forest Service's interpretation of its Forest Plan should receive great deference from reviewing courts . . . ."  Martin, 168 F.3d at 4.  It is ultimately a judgment call whether a particular management activity will so adversely affect a species that a violation of the Forest Plan's direction that the status of such species be maintained or enhanced results.  Given the procedural posture of this action, it is not the place of this court to determine whether the status of threatened or sensitive species will be diminished as a result of the approval of the Trout Slope Project.  Rather, the court must determine whether Defendants' conclusion that project approval will not result in diminishment of species status is arbitrary or capricious.  Defendants possessed substantial data concerning the three-toed woodpecker and

---

[11]Plaintiffs also raise claims regarding the Northern goshawk and Colorado River cutthroat trout, but, as those species are Ashley NF MIS, Plaintiffs' claims concerning those species will be analyzed in connection with Plaintiffs' allegation that Defendants failed to comply with MIS monitoring obligations.

compared that data to the anticipated effects of the Trout Slope Project before concluding that

project approval would not adversely effect the three-toed woodpecker as a species.  Similarly, as

discussed above, Defendants, in light of the lack of information concerning lynx in the forest,

assumed the presence of lynx in the project area when weighing potential negative effects on that

species.  This court concludes that Defendants' determination that the Trout Slope Project will

not result in a diminishment of the status of these species is adequately supported by the record.

## 3.  MIS requirements

Plaintiffs contend that Defendants' approval of the Trout Slope Project should be

reversed because Defendants arbitrarily chose MIS and maintained insufficient data to comply

with regulatory assessment obligations.  Plaintiffs' argument is complicated by the fact that the

record does not reveal whether Defendants considered the MIS Amendment effective at the time

of the approval of the Trout Slope Project.  The decision rendered after an administrative appeal

of the project's approval concluded that Defendants were only obligated to evaluate the potential

impacts of the Trout Slope Project by analyzing the two MIS that remained following approval

of the MIS Amendment.  (See AR TS06521-22.)  Despite that conclusion, the analysis contained

in the EIS appears to have been conducted under the assumption that all twelve MIS remained

relevant to project approval.  Defendants explain the apparent discrepancy by noting that the MIS

Amendment was proceeding at the same time the Trout Slope Project was being considered for

approval.  Consequently, Defendants argue that although MIS that were dropped pursuant to the

MIS Amendment were considered in the EIS, all analysis of dropped MIS was gratuitous and

Defendants were only required to monitor the two MIS retained after approval of the MIS

Amendment.

The court has previously concluded that the MIS Amendment was improper, as it reduced

the number of MIS to such a point that compliance with overall regulatory monitoring

obligations would become impossible.  But because the EIS ultimately relied upon an analysis of

five species--all of which were considered MIS before the MIS Amendment--the approval of the

Trout Slope Project may still be in compliance with applicable regulatory requirements.

      Further complicating this issue is the reoccurring question of which version of the

Department of Agriculture regulations apply.  As with the MIS Amendment, Defendants contend

that the transition rule's "best available science" standard applies, while Plaintiffs contend that

the 1982 rule should govern the project's approval.  The court has previously determined that the

1982 rule applied to the MIS Amendment.  For basically the same reasons, the court concludes

that the 1982 rule applies to the approval of the Trout Slope Project.

      The record here contains no indication that Defendants intended to make use of the "best

available science" standard provided by the transition rule when considering the Trout Slope

Project for approval.  Ashley NF cannot avail itself of the transition rule after the fact in an

attempt to explain away any failure to comply with the 1982 rule.  As a result, Defendants'

approval of the Trout Slope Project will be analyzed under the 1982 rule.

      Defendants analyzed five MIS species when deciding whether to approve the Trout Slope

Project: Colorado River cutthroat trout, macroinvertebrates, elk, deer, and Northern goshawk.

These species were selected for analysis because Defendants concluded that no other suitable

species resided in the project area.  (See id. at TS06371 ("Management indicator species were

studied along with their relevant population data.  Those species that inhabit the project area or

could inhabit the project area were examined for effects."); see also id. at TS04419.)  Plaintiffs

raise no claims regarding Defendants' analysis of macroinvertebrates, elk, or deer.  Instead,

Plaintiffs focus on the Northern goshawk and the Colorado River cutthroat trout, claiming that

Defendants improperly concluded that the status of Northern goshawk will not be diminished by the Trout Slope Project and claiming that Defendants have failed to comply with MIS monitoring obligations in regard to the Colorado River cutthroat trout.

Discussing the Northern goshawk, Plaintiffs' argument is in all relevant senses identical to the argument they raised in relation to Defendants' treatment of threatened and sensitive species.  Essentially, Plaintiffs point to the EIS's determination that individual goshawks may be affected by the Trout Slope Project.  Plaintiffs then argue that this recognition renders project approval inappropriate.  In contrast, Defendants steadfastly maintain that potential harm to certain individual goshawks does not necessarily foreclose project approval and that the true inquiry is whether the management action will negatively affect viability on a species level.  The record reveals substantial information regarding the Northern goshawk and adequately supports Defendants' conclusion that the Trout Slope Project will cause only short-term negative effects to the Northern goshawk that are insufficient to adversely affect the species's status.  Accordingly, Defendants' determination, on this record, cannot be fairly characterized as arbitrary or capricious.

Plaintiffs' challenge concerning the Colorado River cutthroat trout centers on their contention that Defendants failed to adequately monitor the species and therefore cannot rely on that species as a MIS for the purposes of project approval.  The court agrees.  Defendants have not directed this court to any information supporting their assertion that population trend data exist for this MIS.  In fact, the EA created as part of the MIS Amendment process states just the opposite.  "The monitoring plan for cutthroat trout in the Forest Plan states that [Utah Division of Wildlife Resources] data would be used to determine trends that would be collected at five-year intervals.  This has not occurred.  UDWR has inventoried many streams to determine

presence/absence, but there is no population trend data[.]" (Id. at MIS1660 (emphasis added).)

"Plainly the regulations require that the Forest Service monitor population trends of the MIS in

order to evaluate the effects of forest management activities on the MIS and the viability of

desired fish and wildlife populations in the forest more generally." UEC I, 372 F.3d at 1226.

Despite the lack of data on Colorado River cutthroat trout, the court concludes that

Defendants' approval of the Trout Slope Project was consistent with MIS monitoring obligations

imposed by the 1982 rule.  Excluding the Colorado River cutthroat trout, Defendants analyzed

four MIS that they determined were located in the project area or that could potentially reside

within the project area.  There is no bright line marking the point at which MIS obligations have

been met, but the court is not persuaded that Defendants acted arbitrarily or capriciously in this

regard.

### B.  NEPA Claims

Plaintiffs allege that Defendants violated NEPA by failing to provide a cumulative impact

analysis in the EIS issued in connection with the approval of the Trout Slope Project.  EISs are

required to contain such an assessment.  See Grand Canyon Trust v. FAA, 290 F.3d 339, 345

(D.C. Cir. 2002).  "Cumulative impact" is defined as:

> the impact on the environment which results from the incremental impact of the
> action when added to other past, present, and reasonably foreseeable future action
> regardless of what agency (Federal or non-Federal) or person undertakes such
> other actions.  Cumulative impacts can result from individually minor but
> collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7.  The D.C. Circuit has stated that:

> A meaningful cumulative impact analysis must identify (1) the area in which the
> effects of the proposed project will be felt; (2) the impacts that are expected in
> that area from the proposed project; (3) other actions--past, present, and proposed,
> and reasonably foreseeable--that have had or are expected to have impacts in the
> same area; (4) the impacts or expected impacts from these other actions; (5) the
> overall impact that can be expected if the individual impacts are allowed to

accumulate.

Grand Canyon Trust, 290 F.3d at 345.  Following the guidance of the D.C. Circuit, it is the task

of this court to ascertain whether Defendants took the requisite "hard look" at the various

alternatives presented.  See Silverton Snowmobile Club, 433 F.3d at 781 ("[D]ocuments

prepared as part of NEPA's 'hard look' requirement must not only reflect the agency's

thoughtful and probing reflection of the possible impacts associated with the proposed project,

but also provide a reviewing court with the necessary factual specificity to conduct its review."

(internal quotation omitted)).

The EIS in question contains an entire chapter, spanning nearly eighty pages, devoted to

discussion and analysis of the cumulative impact associated with project approval.  (See AR

TS04361-439.)  The assessment lists fourteen "other activities in the project area," identified

with varying levels of detail,[12] that Defendants purportedly considered when undertaking the

cumulative impact analysis.  (Id. at TS04362.)  The cumulative impact analysis assessed the

impact of the listed projects on vegetation resources, fire ecology, water resources, soil resources,

fishery resources, wildlife resources, recreational resources, visual and scenic resources, cultural

resources, socio-economic resources, and environmental justice.  Such assessments are, by

necessity, complex.  The record reveals that Defendants gathered and assessed voluminous data

when evaluating the cumulative impact of project approval.[13]  The court concludes that

---

[12]For example, one identified activity is an "Annual Boy Scout gathering at Windy Park,"
while another broadly covers "All past timber harvesting activity."  (See AR TS04362.)

[13]For example, the EIS relied upon exceedence reports generated by the State of Utah and
detailed water quality sample data.  (See AR TS06128-61.)  The EIS also provided additional
analysis relative to water quality and watershed conditions, including cumulative effects on
fisheries and soils.  (See id. at TS03740, TS04403-05, TS04410-11.)  Also, Defendants
conducted pre- and post-project sediment comparisons, concluding that post-project sediment
delivery would be comparable to pre-project rates with a very low risk of sediment reaching

Defendants' analysis, in its relation to wildlife, water quality, and environment generally, is "legally sufficient."  See Custer County Action Ass'n, 256 F.3d at 1036.

### C.  ESA Claim

Plaintiffs claim that Defendants violated the ESA by failing to engage in a formal consultation with the U.S. Fish and Wildlife Service concerning the Trout Slope Project's potential impact on lynx population.  The regulations implementing the ESA require federal agencies to "review actions at the earliest possible time to determine whether any action may affect listed species or critical habitat."  50 C.F.R. § 402.14(a).  If such a determination is made, generally the agency must engage in formal consultation with the U.S. Fish and Wildlife Service.  Id.  A formal consultation is not required if the agency prepares a biological assessment concluding that the proposed action is not likely to adversely affect the species or if the agency informally consults with the U.S. Fish and Wildlife Service and the agencies agree that a negative impact is not likely.  Id. § 402.14(b).

Here, Defendants prepared a biological assessment and informally consulted with the U.S. Fish and Wildlife Service, which issued a letter to Defendants concurring in the position that a formal consultation was not required because the possibility of the Trout Slope Project having an adverse effect on lynx was remote.  (See AR TS04244-46.).  The process followed by Defendants satisfies ESA requirements.

Really, it appears that the true nature of Plaintiffs' allegation is that the U.S. Fish and Wildlife Service did not mean what it said in its letter of concurrence.  According to Plaintiffs, additional comments contained in the concurrence letter belie the U.S. Fish and Wildlife

---

water bodies except at crossings.  (See id. at TS02476-85, TS02201-2443, TS04392, TS04396-97.)

Service's true conclusion: that the Trout Slope Project, as contemplated at the time the letter was issued, would have an adverse impact on lynx.  While the court acknowledges that the concurrence letter cannot fairly be classified as a whole-hearted endorsement of the position that no harm to lynx would result from project approval, the U.S. Fish and Wildlife Service did state its agreement (however tentative) that a formal consultation would not be necessary.  The court sees no reason not to take the U.S. Fish and Wildlife Service at its word and therefore rejects Plaintiffs' claim that Defendants violated ESA requirements.

### **Conclusion and Order**

_____The court GRANTS in part and DENIES in part Plaintiffs' Olenhouse Motion.  The court concludes that Defendants' reduction of the number of MIS monitored in Ashley NF from twelve to two will effectively cripple Defendants' ability to comply with applicable federal regulations.  Therefore, the court reverses approval of that amendment.  The court concludes that approval of the Trout Slope Project was legally sufficient and therefore affirms the project's approval.

DATED this 9th day of February, 2006.

BY THE COURT:

_Tena Campbell_

TENA CAMPBELL
United States District Judge